UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOANNE MOSKOVIC, et al.,

       Plaintiffs,

       Case No. 1:21-cv-144

v.

       Hon. Hala Y. Jarbou

CITY OF NEW BUFFALO,

       Defendant.

_____/

218 S BRONSON LLC, et al.,

       Plaintiffs,

       Case No. 1:21-cv-674

v.

       Hon. Hala Y. Jarbou

CITY OF NEW BUFFALO,

       Defendant.

_____/

## OPINION

       Plaintiffs in this consolidated action own homes in the City of New Buffalo, Michigan, that they have used, or intend to use, as short-term rental properties. In 2019, the City passed an ordinance requiring homeowners in the City to obtain a permit before using their homes as short-term rentals. In 2020, the City adopted a resolution that suspended the issuance of such permits. Plaintiffs brought this action against the City to challenge the validity of that resolution under state and federal law. Before the Court is Plaintiffs' motion for partial summary judgment (ECF No. 116)[1] on Counts V and VII of the amended complaint. Also before the Court is the City's

_____

[1] All citations to the record refer to the record in Case No. 1:21-cv-144 unless otherwise noted.

motion for summary judgment (ECF No. 117).  For the reasons herein, the Court will grant Plaintiffs' motion in part and grant the City's motion in part.  The Court will grant summary judgment in favor of 218 S Bronson LLC on the equal protection claim.  The Court will dismiss all other claims.

# I. BACKGROUND

## A. History

The City of New Buffalo is located on the Lake Michigan shoreline near the Indiana border. It is a popular destination for tourists from Michigan, Indiana, and Illinois, especially during the summertime.  Plaintiffs purchased homes in the City with the intent to rent them to visitors on a short-term basis, *i.e.*, for terms of less than a month at a time.

### 1. Ordinance 237 Requires Permits for Short-Term Rentals

In April 2019, after some members of the City Council became concerned about the impacts of short-term rentals on the character of the community, the City passed Ordinance 237, which required homeowners to apply for and obtain a permit from the City in order to use their homes as short-term rentals.  (Ordinance 237, ECF No. 13-2.)  To qualify for a permit, applicants had to provide their contact information and the contact information for a local agent.  Also, they had to provide information about their home, certify that they had working smoke alarms and fire extinguishers, consent to inspections upon request, and create a brochure for guests providing their contact information.  (*Id.*, PageID.311-312.)  Finally, they had to submit to an annual inspection "for compliance with applicable codes and ordinances," including "zoning, construction, fire, and property maintenance codes[.]"  (*Id.*, PageID.313.)  Failure to "satisfactorily complete an inspection" could be grounds for withholding a permit or deeming it void.  (*Id.*, PageID.312.)  The ordinance also put a limit on the number of people that could occupy a dwelling.  (*Id.*, PageID.315.) There was no cap on the number of permits that the City would issue.

2

### 2. Moratorium

On May 18, 2020, the City Council adopted Resolution 2020-11, which imposed an eight-month moratorium ("Moratorium") on all permit applications for, and registrations of, short-term rental units in the City.  (Resolution 2020-11, ECF No. 61-3.)  The City Council indicated that it was "concerned that further increases in short-term rentals in certain areas of the City could undermine the character and stability of neighborhoods in certain districts" by, among other things, decreasing the number of long-term residents, decreasing enrollment in schools, decreasing the availability of long-term housing, permitting significant numbers of vacant homes during winter months, and increasing noise levels, traffic, and on-street parking during summer months.  (*Id.*, PageID.2362.)  The City Council also indicated that it was considering "appropriate ordinance amendments to address this concern relating to the City's existing-short term rental ordinance[.]" (*Id.*)

On May 22, 2020, the City Clerk accidentally distributed a draft copy of Resolution 2020-11 that contained exceptions that were not part of the final version.  (Fidler Dep., ECF No. 117-2, PageID.3564.)

A few weeks later, on June 15, 2020, the City Council adopted Resolution 2020-16, which carved out exceptions to the Moratorium for certain property owners with "investment-backed expectations" in their property, including those who had made "substantial investments in prospective rental properties" before the Moratorium.  (Resolution 2020-16, ECF No. 61-6.)  It allowed the City to process applications received during the next 30 days, where: (1) the property was already registered as a short-term rental and was conveyed to new owner before June 15, 2020; (2) the applicant took title to the property between March 1, 2020 and May 18, 2020, with the intent to use it as a short-term rental; (3) the applicant recently completed construction or renovations with intent to use the property as a short term rental and was issued a certificate of

occupancy after March 1, 2020; (4) the applicant entered into a contract to purchase the property on or before May 18, 2020, with intent to use it as a short-term rental; or (5) the applicant had a valid building permit for construction or renovation of a dwelling as of May 18, 2020, with intent to render it suitable for use as a short-term rental.  (*Id.*)

### B. Review of Ordinance Amendments

In November 2020, three new members were elected to the City Council, including the City's Mayor, John Humphrey.  (11/16/2020 City Council Minutes, ECF No. 121-7.)

By December 2020, the City Council's review of proposed regulations for short-term rentals was not complete.  The Interim City Manager reported that "additional research needs to be done" and that "enforcement of the ordinance needs [to be] addressed."  (Manager's Rep., ECF No. 13-10.)  The review had been complicated by the fact that the City Manager had fallen ill with COVID-19 before Thanksgiving and passed away in early December.  The Interim City Manager recommended extending the Moratorium for an additional eight months.  The City Council did so on December 21, 2020.

On March 17, 2021, the City Council and the City's Planning Commission held a joint meeting to review a draft amendment to Ordinance 237 and a draft amendment to the City's Zoning Ordinance that addressed short-term rentals.  (3/17/2021 Meeting Agenda, ECF No. 121-8.)  The proposed zoning ordinance amendment would cap the number of short-term rentals in the R-1 residential district at the "existing level" of 65.   (Proposed Ordinance, ECF No. 121-8, PageID.5452-5453.)

The Planning Commission held a public hearing on the proposed amendment to the zoning ordinance on April 13, 2021, after which it tabled the amendment for further discussion. (4/13/2021 Planning Comm'n Minutes, ECF No. 121-9, PageID.5465.)  At its next meeting a week later, the Planning Commission recommended that the City Council make a few small changes to

the proposed zoning ordinance amendment. (4/20/2021 Planning Comm'n Minutes, ECF No. 121-10, PageID.5470.)

On May 17, 2021, the City Council adopted Ordinance 248, which amended Ordinance 237 by adding additional requirements for obtaining, maintaining, and transferring a short-term rental permit. (*See* Ordinance 248, ECF No. 41-7.) The Moratorium continued.

On August 31, 2021, the City Council extended the Moratorium for another two months, until November 1, 2021, in order to continue considering the "proposed zoning amendment." (Resolution 2021-21, ECF No. 117-3, PageID.3601.) That same day, the City Council proposed an alternative zoning ordinance amendment that would prohibit short-term rentals in the R-1, R-2, and R-3 zoning districts. Those are the districts where almost all of Plaintiffs' properties are located. It referred this proposed amendment to the Planning Commission. (*See* 8/31/2021 City Council Minutes, ECF No. 117-4, PageID.3605.) In support of extending the Moratorium, the City Manager explained

> [T]he city has made considerable progress in studying various issues relating to short-term rentals; developing a modified set of regulations; implementing a strategy for not only short-term rentals, but city-wide enforcement; and the commencement of data collection. This progress was also to include the Planning Commission and City Council determining the need for improved zoning regulations.
>
> The city's ultimate goal has been to develop the necessary framework for terminating the moratorium in the city. In order to achieve this, the most imperative of which is the Planning Commission's work in developing zoning ordinance amendments. The city has . . . received bids for a consultant to assist with this endeavor. . . .

(8/31/2021 Mem. from City Manager to Mayor, ECF No. 121-12.) He recommended an extension of the Moratorium "to facilitate the review and updating of the city's Zoning Ordinance." (*Id.*)

On September 16, 2021, the Planning Commission held a public hearing on the two alternative proposed zoning ordinance amendments.  (9/16/2021 Planning Comm'n Minutes, ECF No. 118-35.)  The Planning Commission tabled the matter until its next meeting on September 21.

On September 20, 2021, the City Council adopted a resolution directing the Planning Commission to make a recommendation on the two zoning amendments at the September 21 meeting "so that the Council can commence its deliberations on the proposed amendment in October, before the moratorium expires."  (Resolution 2021-22.a, ECF No. 121-14.)

At its meeting on September 21, 2021, the Planning Commission recommended against both of the proposed amendments. (9/21/2021 Planning Comm'n Minutes, ECF No. 118-38.)  Part of the meeting was held in a closed session to discuss an "attorney-client privileged memorandum." (*Id.*, PageID.4655.)

Because the Planning Commission's recommendation was not binding, the City Council held the "first reading" on the proposed amendments on October 4, 2021.  (10/4/2021 City Council Agenda, ECF No. 117-5.)  Before the second reading, property owners demanded a public hearing on the amendments.  The City Council held a public hearing and the second reading on November 23, 2021.  (Special Council Meeting Agenda, ECF No. 117-7.)

### C. Ordinance 253 Prohibits New Short-Term Rentals in Certain Districts

At the public meeting on November 23, 2021, the City Council adopted Ordinance 253, which generally prohibits the use of homes as short-term rentals in the R-1, R-2, and R-3 residential zoning districts.  (*See* Ordinance No. 253, ECF No. 117-10, PageID.3688-3690.)  Short-term rental units "that existed and were registered" as of November 23, 2021, could continue as "nonconforming uses" if they complied with the City's regulatory requirements.  (*Id.*, PageID.3690.)  Ordinance 253 became effective on December 13, 2021, the day that the Moratorium expired.

6

### D. Procedural History

#### 1. Plaintiffs' Complaint

The plaintiffs in each case filed their respective actions while the Moratorium was in effect. The plaintiffs in Case No. 1:21-cv-144 filed their original complaint in this Court in February 2021.  The plaintiffs in Case No. 1:21-cv-674 filed their original complaint in Berrien County Circuit Court in June 2021.  The City subsequently removed that action to this Court, where it was eventually consolidated with Case No. 1:21-cv-144.  The most recent versions of the complaints in each case are substantially the same as one another, so the Court will refer to those pleadings as the complaint.

Plaintiffs are 26 individuals and several entities owning approximately 17 homes in the City.  They claim that they have been unable to obtain a permit to use their properties as short-term rentals.  They submitted applications for short-term rental permits but the City did not process them due to the Moratorium.  And because of Ordinance 253, they claim that they will not be able to use their homes as short-term rentals in the future.

Plaintiffs assert the following claims against the City:  violation of the "doctrine of legislative equivalency"[2] (Count I); violation of Michigan's Zoning Enabling Act (MZEA), Mich. Comp. Laws § 125.3101 et seq. (Count II); violation of the Commerce Clause of the U.S. Constitution (Count III); violation of Michigan's Open Meetings Act (OMA), Mich. Comp. Laws § 15.623 (Count IV); violation of the right to substantive due process in the Michigan constitution and the Fifth and Fourteenth Amendments to the U.S. Constitution (Count V); denial of procedural due process under the Michigan constitution and the Fifth and Fourteenth Amendments to the U.S. Constitution (Count VI); denial of the right to equal protection in the Michigan Constitution and

---

[2] Plaintiffs contend that the Moratorium effectively suspended Ordinance 237.  They argue that the City could not suspend an ordinance using a resolution.

7

the Fourteenth Amendment to the U.S. Constitution (Count VII); the City took their property without just compensation, in violation of the Michigan and U.S. constitutions (Count VIII); and preemption under the Michigan Constitution (Count IX).

### 2. Court's Prior Opinions

On April 15, 2021, the Court denied Plaintiffs' request in Case No. 1:21-cv-144 to enjoin the Moratorium because the Court was not persuaded that they had shown a substantial likelihood of success or irreparable harm in the absence of an injunction.  (4/15/2021 Op., ECF No. 22.)

On February 3, 2022, the Court denied Plaintiffs' motion for partial summary judgment on Counts I and II of the complaint because those counts challenged the validity of the Moratorium, which no longer existed.  Plaintiffs filed their motion in July 2021.  Before the Court ruled on that motion, the Moratorium expired.  The Court asked the parties to provide supplemental briefing on the effect of that expiration on Plaintiffs' motion.  After they did so, the Court denied Plaintiffs' motion, summarizing its reasoning as follows:

> [A]t this stage of the proceedings, the Court is not persuaded that it can grant any relief on Counts I and II, which challenge the validity of a moratorium that no longer exists.  Neither Plaintiffs' motion for summary judgment on those claims, nor their subsequent briefing, adequately account for the fact that the Moratorium has expired. Plaintiffs cite no persuasive authority for the proposition that the Court can award meaningful relief in these circumstances.  Plaintiffs might be entitled to some form of injunctive relief if they can satisfy an exception to the general rule that the Court is obligated to apply the zoning law in effect at the time of its decision.  However, Plaintiffs have not squarely addressed that issue.

(2/3/2022 Op. 9, ECF No. 84.)

Plaintiffs now seek summary judgment on Counts V (substantive due process) and VII (equal protection).  The City seeks summary judgment on all counts.

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).  "This standard of review remains the same for reviewing cross-motions for summary judgment."  *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021).  "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'"  *Id.* at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

### III. ANALYSIS

#### A. Standing Generally

The City argues that some Plaintiffs lack standing.

##### 1. Gene Khalimsky and Edan Gelt

The City initially argued that Plaintiffs Khalimsky and Gelt lacked standing in this matter because they had transferred their property to themselves as trustees of The Gene M. Khalimsky and Edan J. Gelt Trust.  They applied for a permit on behalf of the trust.  Plaintiffs note that Khalimsky and Gelt have standing because they are agents of the Trust and the Trust assigned its rights in its claims to them.  Accordingly, the City has withdrawn its standing argument as to these Plaintiffs.  (*See* Def.'s Reply Br. 3, ECF No. 123.)

### 2. Jodi Grant and Jeff Segbarth

The City argues that Plaintiffs Grant and Segbarth lack standing because their properties are located in WM and PUD districts, respectively.   However, these plaintiffs have standing because they claim injury as a result of Ordinance 237 and the Moratorium, which required them to obtain a permit for using their home as a short-term rental and then prevented them from doing so.  Accordingly, they have suffered an injury in fact necessary to establish standing.

### B. Counts I & II

The City argues that the Court should grant summary judgment in their favor on *all* claims that challenge the validity of the Moratorium, which has expired.  The City argues that these claims are moot.  As the Court discussed in its February 3, 2022, opinion, the Court is not persuaded that it can grant damages under Counts I and II of the amended complaint.  (2/3/2022 Op. 9.)  Count I asserts that the Moratorium was invalid under the doctrine of legislative equivalency and Count II asserts that the Moratorium was invalid under the MZEA.  Plaintiffs cite no precedent for damages relief under the doctrine of legislative equivalency or for a violation of the MZEA.  But as Plaintiffs point out, they also seek damages under their *other* claims, which arise under the U.S. and Michigan constitutions.  Where damages are available, Plaintiffs' claims are not moot.

In its February 3, 2022, opinion the Court also concluded that Plaintiffs would not be entitled to declaratory or injunctive relief under Counts I and II because Michigan courts generally apply the law "'which was in effect at the time of decision [by the trial court].  Thus, if a zoning ordinance has been amended [after suit was filed] . . . a court will give effect to the amendment[.]'" *Grand/Sakwa of Northfield, LLC v. Northfield Twp.*, 851 N.W.2d 574, 578 (Mich. Ct. App. 2014) (quoting *Klyman v. City of Troy*, 198 N.W.2d 822, 824 (Mich. Ct. App. 1972)).  Here, the law in effect is Ordinance 253, which prohibits short-term rentals in the areas where the homes of most of the plaintiffs are located.  Although Ordinances 237 and 248 allowed short-term rentals with a

permit, Ordinance 253 prohibits permits for new properties.  If Michigan law requires the Court to give effect to Ordinance 253, rather than 237 or 248, then Plaintiff's challenges to the validity of the Moratorium in Counts I and II are effectively moot.  Enjoining the Moratorium or declaring it invalid would serve no purpose.  Plaintiffs seek to have the Court enforce Ordinance 248 without the Moratorium, but the general rule in *Grand/Sakwa* prevents the Court from doing so.

The Court's previous opinion is not the final word, however, because the rule in *Grand/Sakwa* is subject to "two narrow exceptions."  *Id.*  "'A court will not apply an amendment to a zoning ordinance where (1) the amendment would destroy a vested property interest acquired before its enactment, or (2) the amendment was enacted in bad faith and with unjustified delay.'"  *Id.* (quoting *Rodney Lockwood & Co. v. City of Southfield*, 286 N.W.2d 87, 89 (Mich. Ct. App. 1979)).  Plaintiffs did not argue these exceptions in their previous motion for partial summary judgment, so the Court did not address them.  Plaintiffs now contend that both exceptions apply.

*Exception 1: Vested Property Interest.*  Plaintiffs contend that they acquired a vested property interest in using their homes as short-term rentals by using them as such, or preparing to do so, before the enactment of Ordinance 253.  The Michigan Supreme Court has described a "prior nonconforming use [as] a vested right in the use of particular property that does not conform to zoning restrictions, but is protected because it lawfully existed before the zoning regulation's effective date."  *Heath Twp. v. Sall*, 502 N.W.2d 627, 629 (Mich. 1993).  "To be protected, the nonconforming use must have been legal at one time; a use that violates the zoning ordinances since its inception does not draw such protection."  *Lyon Charter Twp. v. Petty*, 896 N.W.2d 477, 481 (Mich. Ct. App. 2016).

Similarly, the MZEA expressly protects nonconforming uses that were legal before the enactment of a zoning ordinance:

> If the use of a dwelling, building, or structure or of the land is lawful at the time of enactment of a zoning ordinance or an amendment to a zoning ordinance, then that use may be continued although the use does not conform to the zoning ordinance or amendment. . . .

Mich. Comp. Laws § 125.3208(1).  In other words, "alterations to zoning or other property-use ordinances may only apply prospectively and may not destroy already-vested property interests." *Twp. of Indianfields v. Carpenter*, No. 350116, 2020 WL 4249168, at *7 (Mich. Ct. App. July 23, 2020).

To obtain a vested right in a nonconforming use, a property owner must actually use their property lawfully in the nonconforming way or conduct "work of a 'substantial character' . . . by way of preparation for an actual use of the premises" before the zoning requirements change. *Bloomfield Twp. v. Beardslee*, 84 N.W.2d 537, 542 (Mich. 1957).  "Mere 'preliminary' operations, e.g., ordering of plans, surveying the land, removal of old buildings, are not sufficient."  *Id.* (quoting *City of Lansing v. Dawley*, 225 N.W. 500 (Mich. 1929)).  Here, Plaintiffs aver that, before the enactment of Ordinance 253, they were either lawfully using their homes as short-term rental properties or they had performed substantial work to prepare their homes for that use.  (*See* Pls.' Affs., ECF Nos. 118-2 to 118-24.)

The City responds that, in fact, Plaintiffs' uses were not lawful under the City's Zoning Ordinance.  That ordinance provided, in relevant part:

> E. Uses permitted by right. All land development specifically listed under the heading "Uses Permitted by Right" shall be allowed when determined to be in accordance with all provisions of this ordinance and all other applicable laws, regulations or ordinances having jurisdiction over the proposed use of land. *Where not specifically permitted, uses are prohibited, unless construed to be similar to a use as expressly determined in accordance with Section 1-4G.*
>
> * * *
>
> G. Uses not specifically mentioned.

1. Any use of land or development activity not specifically mentioned in this ordinance may be classified by the Zoning Administrator as the use most similar in character to the proposed use.

2. If the Zoning Administrator needs further interpretation of the proposed use, the Official may refer the proposed use to the Board of Zoning Appeals for classification.

3. If the Board of Zoning Appeals finds that the use is not similar in character to uses listed in the Ordinance they shall so find. The applicant may then make application to the Planning Commission for consideration of an amendment to the Zoning Ordinance to include the proposed use in one or more of the zoning districts of this ordinance, either as a Use Permitted by Right or a Use Permitted by Special Land Use.

(Zoning Ordinance § 1-4, ECF No. 121-2 (emphasis added).)

In other words, the Zoning Ordinance prohibited uses that were not expressly permitted. Plaintiffs do not contend that the Zoning Ordinance expressly permitted the use of residential property for short-term rentals, and there is no evidence that the Zoning Administrator or the Board of Zoning Appeals decided to classify that use as a permitted use or as similar to one. Accordingly, the Zoning Ordinance indicates that Plaintiffs did not acquire a vested property interest in using their properties as short-term rentals because that use was never "lawful."

The City acknowledges that there was some "historical ambiguity" on this point. (Def.'s Br. in Resp. in Pls.' Mot. 4, ECF No. 121.) At a meeting with the City Council in October 2020, the City Attorney indicated that the City "has interpreted the zoning ordinance to allow [short-term rentals as] a part of the various permitted 'dwelling' uses," meaning that such rentals "are allowed by right in residential zoning districts[.]" *See* Video of City Council-Planning Commission Special Joint Meeting:  October 12, 2020, available at https://cityofnewbuffalo.org/meetings/city-council-planning-commission-special-joint-meeting-october-12-2020/.  He made similar statements in his deposition.  (Curcio Dep. 51, 148, ECF No. 118-25.)  But as the City notes, those statements are legal opinions.  They do not bind the City or the Court in this litigation.  The City Attorney acts as

an advisor to the City Council; his statements are not the law.  (*See* City Charter § 4.5(b), ECF No. 117-8.)  Plaintiffs offer no interpretation of the Zoning Ordinance that would support their position.

Plaintiffs argue that the City's decision to pass Ordinance 237, which expressly prohibited short-term rentals without a valid permit, establishes that such uses were, in fact, permitted by the Zoning Ordinance.  Generally speaking, "[p]ermits are not issued by local authorities when the contemplated use for which the permit is issued conflicts with a local zoning ordinance." *Dingeman Advert. v. Algoma Twp.*, 223 N.W.2d 689, 691 (Mich. 1974).   But that is not always the case.  *See, e.g.*, *Pittsfield Twp. v. Malcolm*, 134 N.W.2d 166, 172 (Mich. 1965) (city granted building permit despite violation of zoning ordinance).  A municipality could decide to regulate and monitor certain uses, as the City did here, rather than enforce a zoning ordinance that would prohibit them.  And at any rate, this Court must interpret the Zoning Ordinance as it is written.  *See Brandon Charter Twp. v. Tippett*, 616 N.W.2d 243, 245 (Mich. Ct. App. 2000) (noting that ordinances are interpreted in the same manner as statutes).  Plaintiffs have provided no plausible argument for construing the text of the City's Zoning Ordinance to permit short-term rentals.

This might have been a different case if the City had given permits to Plaintiffs, who then relied on those permits to use their homes for short-term rentals.  In that situation, Plaintiffs could potentially claim a protected interest in the permits.  *See Dingeman Advert.*, 223 N.W.2d at 691 ("[T]he issuance of a permit . . . , the possession thereof, and substantial reliance thereon, will give" "vested rights to a nonconforming use to the holder thereof[.]").  But that is not what happened here.  Plaintiffs never received permits from the City to use their homes as short-term rentals.  Accordingly, Plaintiffs do not have a protected property interest in the nonconforming use

14

of their homes as short-term rentals because that use was not permitted by the City's Zoning Ordinance.

In the alternative, the City argues that Plaintiffs cannot claim a protected property interest because they were not using their homes "lawfully" under Ordinance 237, which required a permit for short-term rentals.  That argument is not persuasive.  The Michigan Supreme Court's decision in *Drysdale v. Beachnau*, 101 N.W.2d 346 (Mich. 1960) undermines the City's position.  There, the property owner operated a garbage dump in violation of county health regulations.  *Id.* at 347.  The township later enacted a zoning ordinance that rendered the property's use as a dump a nonconforming use.  Three years later, the county health department contacted the property owner, who promptly complied with the health regulations.  The appellants argued that the owner's violation of the health regulations meant that the nonconforming use was not "lawful."  The Michigan Supreme Court disagreed, stating that "violation of a . . . *regulatory ordinance* [does not] necessarily destroy[] the lawfulness of the basic use where compliance with the regulation can be had on demand and where such compliance actually follows."  *Id.* (emphasis added).

Years later, the Michigan Court of Appeals cited *Drysdale* and suggested in dicta that a landowner's failure to obtain an operating license before the passage of a zoning ordinance did not destroy his right to the nonconforming use in his property.  *See Warholak v. Northfield Twp. Supervisor*, 225 N.W.2d 767, 770 (Mich. Ct. App. 1975) ("If a failure to make a timely application for a license under the original resolution was the plaintiff's only problem in establishing a nonconforming use prior to adoption of the 1972 resolution and zoning amendment, then he would be entitled to sympathetic treatment by a court of equity.").

Consistent with *Drysdale* and *Warholak*, Plaintiffs interpret the "lawful use" requirement in Mich. Comp. Laws § 125.3208(1) to refer to compliance with *zoning* ordinances, rather than

compliance with *regulatory* ordinances.  *See* 8A McQuillin Mun. Corp. § 25:259 (3d ed.) ("Where illegality results from a statutory provision not related to land use or zoning, one view is that the use does not thereby lose its status as a valid nonconforming use.") (citing cases, but acknowledging that some courts take a different view); *accord* 4 Rathkopf's The Law of Zoning and Planning § 72:14 (4th ed.).  Indeed, the MZEA refers to the lawful "use" of a dwelling, building, structure, or land.  Michigan courts have associated "use" of a building with zoning ordinances.  According to the Michigan Court of Appeals, zoning ordinances "regulate[] the *use* of land and buildings according to districts, areas, or locations," whereas regulatory ordinances control how "*activity* must be conducted pursuant to certain regulations, [such as] obtain[ing] a permit[.]"  *Nat. Aggregates Corp. v. Brighton Twp.*, 539 N.W.2d 761, 768 (Mich. Ct. App. 1995) (emphases added).

Plaintiffs' argument is also consistent with the MZEA more generally, which governs zoning matters.  Thus, the Court concludes that a Michigan court would interpret "lawful" in the MZEA to refer to compliance with existing zoning restrictions.  *Cf. Morgan v. Jackson Cnty.*, 414 P.3d 917, 921-22 (Or. App. 2018) (distinguishing compliance with "business or occupational licensing" from compliance with "zoning or land use regulation" and holding that failure to obtain a business license did not render an auto yard's nonconforming use unlawful under Oregon's zoning statute).  It does not refer to compliance with regulatory ordinances.

Ordinance 237 was a regulatory ordinance, not a zoning ordinance.  It was adopted as part of Chapter 11 of the City's Code of Ordinances; it did not amend the City's Zoning Ordinance.  Also, it did not prohibit short-term rentals altogether.  Instead, it regulated the *manner* in which such rentals were operated by imposing "safeguards" to "ensure that the operation of short-term rentals is done in a safe and controllable manner for the well-being of all in the community."

16

(Ordinance 237, PageID.309.)  Accordingly, that ordinance did not render Plaintiffs' use of their property unlawful within the meaning of the MZEA.

In summary, Plaintiffs' failure or inability to obtain a short-term rental permit did not prevent them from obtaining a vested property interest in the nonconforming use of their properties as short-term rentals.  Instead, they did not obtain a vested property interest because their nonconforming use did not comply with the Zoning Ordinance in effect before Ordinance 253.  Thus, the first exception in *Grand/Sakwa* does not apply because Plaintiffs have not shown that they acquired a vested property interest that was destroyed by Ordinance 253.

*Exception 2:  Bad Faith & Unjustified Delay*.  Plaintiffs also argue that they satisfy the bad faith exception to application of the current zoning ordinance.  "'[T]he test to determine bad faith is whether the amendment was enacted for the purpose of manufacturing a defense to plaintiff's suit.'"  *Landon Holdings, Inc. v. Grattan Twp.*, 667 N.W.2d 93, 98 (Mich. Ct. App. 2003) (quoting *Rodney Lockwood*, 286 N.W.2d at 89).  The Court can apply a new ordinance even if "it serve[s] to strengthen [the municipality's] litigating position."  *Grand/Sakwa*, 851 N.W.2d at 579.  "The factual determination that must control is whether the *predominant* motivation for the ordinance change was improvement of the municipality's litigation position."  *Id.*

The Michigan Court of Appeals has identified some factors a court can consider, including:

> (a) whether the plaintiff had an unquestionable right to issuance of a permit before the amendment, (b) whether the municipality had not forbidden the type of construction the plaintiff proposed before the amendment, (c) whether the ordinance was amended for the purpose of manufacturing a defense to the plaintiff's suit, and (d) whether the city waited until the last possible minute to assert the defense.

*Great Lakes Soc'y v. Georgetown Charter Twp.*, 761 N.W.2d 371, 386 (Mich. Ct. App. 2008).

In *Rodney Lockwood*, the Michigan Court of Appeals found that the bad faith exception did not apply in the following circumstances:

> There is evidence to indicate that the amendment was intended to clarify an ambiguous ordinance. There is also evidence that it had always been the intent of the city council to prohibit persons from living on three levels within the zoning classification. The amendment did not simply rezone plaintiffs' property, but applied equally to all apartment structures throughout the city.

*Rodney Lockwood*, 286 N.W.2d at 89; *see Great Lakes Soc'y*, 761 N.W.2d at 386-87 (considering the same factors).

Similar circumstances are present here. When the City Council first adopted the Moratorium in May 2020, it stated that it was concerned by the effects of "further increases in short-term rentals in several areas of the City[.]" (Resolution 2020-11, PageID.2362.) It also stated that it was "considering appropriate ordinance amendments to address this concern relating to the City's existing short-term rental ordinance[.]" (*Id.*) It hoped to "adopt new regulations" within the next six months. (*Id.*) These statements indicate that the City was considering regulatory amendments (i.e., amendments to Ordinance 237) specifically, but that its *overall concern* was the increasing *number* of properties used as short-term rentals. Indeed, at the meeting where the City Council adopted the Moratorium, the City Attorney advised that the "moratorium would put a freeze in play until the City makes a permanent decision in regards to rentals, such as, the *number* of rentals the City would allow." (5/18/2020 City Council Minutes, ECF No. 13-5, PageID.325.)

On February 11, 2021, the day before Plaintiffs filed the first of their two lawsuits, the Interim City Manager reported to the City Council that the "City Staff and City Attorney are working on revisions to the proposed [short-term rental] regulatory ordinance . . . . The Planning commission will simultaneously begin discussion of a *possible zoning amendment to restrict new [short-term rentals]* at a soon to be scheduled special meeting[.]" (2/11/2021 Manager's Rep., ECF No. 13-14, PageID.352 (emphasis added).)

The plaintiffs in Case No. 1:21-cv-144 filed their initial complaint on February 12, 2021.[3]

(Compl., ECF No. 1.)  A few weeks later, the City Council held a special meeting with the City's

Planning Commission to review a draft amendment to Ordinance 237 *and* a proposed amendment

to the Zoning Ordinance that restricted the number of short-term rentals in part of the City.  (*See*

3/17/2021 Special Meeting Agenda, ECF No. 121-8.)  The Interim City Manager explained that

the amended zoning ordinance would "[c]ap[] the total number of short-term rental units in the R-

1 zoning district at existing levels."  (Workshop Staff Rep., ECF No. 121-8, PageID.5451.)  The

proposed amendment to the zoning ordinance cited the same concerns with short-term rentals that

were identified in the resolution imposing the Moratorium.  (*See* Draft Zoning Ordinance

Amendment, ECF No. 121-8, PageID.5452.)  In other words, before Plaintiffs ever filed their

complaints, the City expressed concerns about the number of short-term rentals and began

considering legal changes that would address those concerns, *including* a zoning amendment that

would limit the number of properties used as short-term rentals.  Ordinance 253 became that

amendment.  This timing indicates that Plaintiffs' lawsuits were not the predominant motivation

for Ordinance 253.

Further, this case is similar to *Rodney Lockwood* in that Ordinance 253 did not target

Plaintiffs' properties specifically.  It applies to everyone who owns homes in the R-1, R-2, and R3

districts.  And it does not apply to the few plaintiffs who own homes outside those districts.

Finally, as in *Rodney Lockwood*, there is evidence that the City amended its Zoning

Ordinance to address a potential ambiguity regarding short-term rentals.  As the City Attorney

explained at the City's planning meeting in October 2020, the City had interpreted the Zoning

---

[3] The plaintiffs in Case No. 1:21-cv-674 filed their initial complaint in state court on October 5, 2021.  (*Nofziger v. City of New Buffalo*, No. 1:21-cv-674 (W.D. Mich.), ECF No. 1-1.)

Ordinance to allow short-term rentals because the ordinance did not specifically mention short-term rentals, or any type of rental occupancy.  And as discussed below, the City's Mayor, John Humphrey, referred to this issue at a City Council meeting in September 2021.  Ordinance 253 clarifies any possible ambiguity by addressing both short-term and long-term rentals.

As evidence in their favor, Plaintiffs point to statements by Humphrey at the City Council meeting on September 20, 2021.  At that meeting, Council Member O'Donnell expressed concerns about moving forward on the proposed zoning restrictions for short-term rentals because he wanted more data; he wanted to know "what areas [of the City] are the worst."  *See* 9/20/2021 Council Meeting Video 1:13:49, https://cityofnewbuffalo.org/meetings/citycouncil-regular-meeting-september-20-2021/.  He argued that "there's no rhyme or reason" why the City was proposing to restrict short-term rentals in all three residential districts or even one.[4]  *Id.* at 1:16:24.  Humphrey responded, "There definitely is. . . .  This was brought to us by our attorneys based on what is going on with our lawsuit."  *Id.*  Humphrey asserted that rentals were not defined in the City's "charter," so the existing ones were "technically" illegal in the residential zones.  *Id.* at 1:16:44.  In order to regulate rentals going forward, Humphrey argued that the City needed to be consistent in how it treated them in all three residential zoning districts.  *Id.* at 1:17:28.  After passing the amendment to the Zoning Ordinance, the City could "make all the changes that we want"; in other words, the City could decide at a future date to limit the number of short-term rentals to a different number based on "data" regarding "how many we need."  *Id.* at 1:18:01-1:18:56.  Humphrey also bemoaned the lack of enforcement action in the past against "illegal rentals."  *Id.* at 1:19:17.  In

---

[4] Recall that the City Council was discussing a resolution to direct the Planning Commission to consider two proposed amendments to the Zoning Ordinance.  One draft proposed limits on short-term rentals in only the R-1 district, whereas the other draft proposed limits in the R-1, R-2, and R-3 districts.

that context, Humphrey stated that the City had been "asking [its] attorneys based on the situation to make this go through in order to meet the deadlines[.]"  *Id.* at 1:20:06.

Later in the meeting, there was a discussion about imposing a tax on short-term rentals to compensate for their local effects and the costs of enforcement.  *Id.* at 1:23:03-1:24:11.  Humphrey asserted that a tax was not possible and that it would not be fair to tax everyone in the City, including those who do not own rental properties.  *Id.* at 1:24:44.  The "fair" solution, Humphrey argued, was to "separate these uses through the zoning [ordinance]."  *Id.*  He stated that he understood the "position" against zoning, but "[the zoning amendments are] recommended to us by our attorneys who feel that, given the lawsuits against the City, following their recommendations is best."  *Id.* at 1:25:43.

At another point, O'Donnell expressed concern about restricting short-term rentals in all three residential zones.  He wanted more data to evaluate "density in all these areas"; he thought the City was "arbitrarily just making decisions" and that Humphrey was "just trying to push this through."  *Id.* at 1:37:13-1:37:31.  He suggested that the City Council "wait a couple months."  *Id.* at 1:40:35.  After some discussion, Humphrey responded that the Council had been "working on" the issue for three years; he mentioned "reports" and "maps" that had been created to examine the "saturation" of short-term rentals.  *Id.* at 1:42:55-1:43:32.  O'Donnell derided Humphrey's position as "just rushing this through because of the lawsuit."  *Id.* at 1:43:40.  Humphrey responded, "I wouldn't say we are rushing it; we are doing it based on the recommendation of our attorneys . . . and you should have a conversation with Matt Zelewski[5] about that."  *Id.* at 1:43:50.

Plaintiffs characterize Humphrey's statements as a disclosure that the City was adopting Ordinance 253 in order to improve its position in this lawsuit.  To the contrary, all his statements

---

[5] Zelewski is an attorney representing the City in these legal proceedings.

were directed at O'Donnell's concern about imposing restrictions on short-term rentals in one or more residential districts before considering more data.  O'Donnell wanted to delay action by the City in order to obtain more information, but Humphrey argued that the City had been considering the issue for an extended period of time and that it had already gathered sufficient data.  Humphrey argued that a zoning amendment was the best way forward, legally and equitably.  His references to the lawsuit and to the attorneys' advice were made in support of that argument, which had little to do with gaining a legal advantage in Plaintiffs' lawsuits.  Further, his reference to "deadlines" was an apparent reference to the deadline for expiration of the Moratorium.  Accordingly, Humphrey's statements provide little support for Plaintiffs' argument.

Plaintiffs also point to testimony by Donald Stoneburner, who was a member of the Planning Commission.  He testified that he was told at the Planning Commission's September 21, 2020, meeting that "the City Council needed to pass the short-term rental zoning ordinance amendment because of legal challenges to the moratorium."  (Stoneburner Dep. 45, ECF No. 121-15.)  But he does not recall who told him this.  (*Id.* at 46.)  He did not speak with anyone on the City Council about the short-term rental amendments, other than Mayor Humphrey.  (*Id.* at 48.)  And that conversation with Humphrey occurred "[w]ay before" the September meeting.  (*Id.*)  In that conversation, Humphrey told Stoneburner that short-term rentals "needed to be addressed immediately because there [were] too many short-term rentals affecting too many residents."  (*Id.* at 49.)

In Stoneburner's view, *part* of the reason why the City Council wanted to pass a short-term rental ordinance amendment was "the legal challenges to the moratorium[.]"  (*Id.* at 57.)  But he also thought that the City Council was pushing forward because it "wanted the short-term rental ordinance enforced."  (*Id.*)  He could not say whether the lawsuits were the "predominant" reason.

(*Id.*)  Indeed, he was not a member of the City Council, so he could not give an opinion on the motivation of its members.  (*See id.* at 47.)

As Stoneburner himself acknowledged, his statements are speculation about the motives of the City Council.  And none of them suggest that the City Council's predominant motivation was to obtain an advantage in Plaintiffs' lawsuits.  Indeed, Plaintiffs' lawsuits have focused on the Moratorium, as Stoneburner recognized.  If anything, Stoneburner's comments suggest that the lawsuits were spurring the City to act more quickly so that it could end the Moratorium, which is not a bad faith basis for passing a zoning ordinance that it had been considering for some time.

Plaintiffs also contend that the text of Ordinance 253 supports their argument because it "reclassifie[s] short-term rentals from a permitted use to a prohibited use[.]"  (Pls.' Br. in Supp. of Mot. for Summ. J. 21, ECF No. 118.)  Plaintiffs do not identify the textual support for this assertion, and the Court cannot find any.  Ordinance 253 says that short-term rental units that "existed and were registered" before its enactment "may be continued as nonconforming uses"; it does not say that such uses were previously permitted by the prior Zoning Ordinance, so it does not "reclassify" them in that respect.  (*See* Ordinance 253, PageID.3690.)  Accordingly, this argument is not supported.

Finally, Plaintiffs argue that the November 23, 2021, date in Ordinance 253 by which a property owner had to obtain a permit in order to qualify their short-term rental as a nonconforming use "serves no purpose other than prohibiting Plaintiffs from using their properties as short-term rentals."  (Pls.' Reply Br. in Supp. of Mot. for Summ. J. 6, ECF No. 122.)  But that is not the case. It is not directed at Plaintiffs in particular; it applies to all homeowners.  It is consistent with the City's actions before Plaintiffs filed their lawsuit and with its concerns about the increase in short-term rentals.  And it corresponds to the date that the City Council adopted Ordinance 253.

23

In short, Plaintiffs have not shown bad faith.  And to the extent "unjustified delay" is a necessary component of the bad faith exception, Plaintiffs have not expressly addressed that component.  Therefore, Plaintiffs have not shown that they meet the standard in Michigan law for enforcing a previous version of an ordinance that was amended while a lawsuit was pending.  That being the case, Plaintiffs' challenges to Ordinance 237 and the Moratorium under state law in Counts I and II are moot because no relief is available to them.  Plaintiffs who own properties in the R-1, R-2, or R-3 residential districts are subject to Ordinance 253, and the Court must apply that ordinance.  Plaintiffs who own properties outside those districts are not subject to Ordinance 253, so they do not require injunctive relief.

### C. Count III  (Commerce Clause)

The City seeks summary judgment on Plaintiffs' claim that the Moratorium violated the Commerce Clause of the U.S. Constitution.  As the Court explained in its April 15, 2021, Opinion,

> "Courts generally reserve dormant Commerce Clause review for laws that protect in-state economic interests at the expense of out-of-state competitors." *Garber v. Menendez*, 888 F.3d 839, 843 (6th Cir. 2018).  State laws that explicitly discriminate against interstate commerce "are almost always invalid," as are laws "that appear neutral but have an impermissibly protectionist purpose or effect." *Id.* In this case, however, there is no evidence of discrimination or protectionist purpose or effect.  [Ordinance 237] and the [M]oratorium treat residents and non-residents of the state the same.  In addition, they treat interstate and intrastate commerce the same.  Residents of Michigan who wish to rent a home in New Buffalo on a short-term basis (as rentors or rentees) are in the same position as non-residents.

> Where a law "has only an incidental effect on interstate commerce, laxer review applies. Such laws will be upheld unless they impose burdens on interstate commerce that clearly exceed their local benefits." *Id.* (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 144-46 (1970)).  In this case, however, there is no indication that the ordinance or moratorium imposes any undue burden whatsoever on interstate commerce.  To the extent that the ordinance and moratorium prevent homeowners or renters from using homes in New Buffalo for short-term rentals, the burden is the same regardless of whether the homeowner or renter are from this state or not.  Plaintiffs fail to cite any relevant authority in which a court struck down a law or regulation under the Commerce Clause because the regulation inhibited commercial transactions that sometimes involve out-of-state participants.

> Indeed, such a rule would put many local laws to the test simply because they regulate businesses involved in interstate transactions.

(4/15/2021 Op. 6.)

Plaintiffs now argue that the Moratorium imposed an excessive burden on interstate commerce that outweighed any local benefits. They argue that it prevented homeowners from earning lost rental income. Some of these homeowners reside outside Michigan, so rentals involving those homeowners might involve interstate transactions. Plaintiffs also argue that the Moratorium prevented them, and many other homeowners on the short-term rental "waitlist" (*see* Short Term Rental Contact List, ECF No. 118-16 (identifying permit applicants)), from providing lodging for travelers, many of whom travel to Michigan from other states.

The Sixth Circuit has adopted "a two-step analysis to evaluate challenges to the dormant Commerce Clause." *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 369 (6th Cir. 2013). Under the first step, the Court looks at whether the state regulation "'directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests.'" *Id.* at 369-70 (quoting *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010)). "'A [state regulation] can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect.'" *Id.* at 370 (quoting *Int'l Dairy Foods*, 622 F.3d at 648). "'[T]he critical consideration is the overall effect of the statute on both local and interstate activity.'" *Id.* (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 579 (1986)). Plaintiffs bear the initial burden of proof to show that the state regulation is discriminatory. *Id.*

If Plaintiffs satisfy their burden, then "'a discriminatory law is virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Id.* (quoting *Dep't of Revenue of Ky. v. Davis*, 553

U.S. 328, 338 (2008)).  But if the state regulation is "neither discriminatory nor extraterritorial, then the Court must apply the balancing test established in *Pike*."  *Id.*

Here, Plaintiffs do not contend that the Moratorium regulated or discriminated against interstate commerce.  Instead, they argue that it fails the balancing test in *Pike* because the burdens that it imposed on interstate commerce clearly outweighed any local benefits.  However, Plaintiffs have not offered evidence that would allow a court to make that analysis.  They provide no real evidence of how much the Moratorium burdened interstate commerce, let alone an undue burden in relation to local benefits.  The burdens identified by Plaintiffs (i.e., a loss of rental income for out-of-state homeowners and a reduction in the amount of available lodging for travelers) may have had no meaningful impact on interstate commerce, particularly if other options for lodging were available.  It is also possible that any burdens affected *intra*state commerce more than *inter*state commerce.  At any rate, conjecture "is no replacement for the kind of proof of real burdens, as opposed to 'hypothetical' burdens, needed to support such a challenge."  *Garber*, 888 F.3d at 845.  "[C]ourts have held that the party challenging the law bears the responsibility of proving that the burdens placed on interstate commerce outweigh the law's benefits, and have turned away challengers who failed to meet that responsibility[.]"  *Id.* (citations omitted).  Plaintiffs have not fulfilled their responsibility here.  Accordingly, the Court will dismiss their claim in Count III.

### D. Count IV (Open Meetings Act)

The City moves for summary judgment on Count IV, which asserts that the Moratorium violated the requirements of the OMA.  Plaintiffs seek to invalidate the Moratorium (and certain resolutions modifying or extending it) under Mich. Comp. Laws § 15.270(2).  Specifically, Plaintiffs target Resolutions 2020-11 and 2020-16, as well as the City Council's vote to extend the Moratorium on December 21, 2021.

### 1. Available Relief

Damages are not available under this claim because Plaintiffs have not sued a public official. *See* Mich. Comp. Laws § 15.273(1) (providing for a damages remedy in a suit against a public official for an intentional violation of the OMA).

And as discussed above, a declaration that the Moratorium was invalid under state law would serve no purpose because the Moratorium has expired and Michigan precedent requires this Court to apply the state law in effect at the time of its decision. Accordingly, this claim is effectively moot because no relief is available to Plaintiffs.

Plaintiffs argue that there is an exception to mootness for cases that are "capable of repetition, yet evading review." *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515 (1911). However, the issue here is that the Court is bound to apply Michigan law as a Michigan court would. If a Michigan court would not grant relief in these circumstances, then this Court cannot do so either.

### 2. Statute of Limitations

In addition, the City notes that much of the claim is untimely. The statute of limitations for bringing a claim under Mich. Comp. Laws § 15.270 is "60 days after the approved minutes are made available to the public by the public body[.]" Mich. Comp. Laws § 15.270(3)(a). Here, the City Council started the Moratorium by adopting Resolution 2020-11 at its May 18, 2020, meeting. It carved out exceptions to the Moratorium through Resolution 2020-16, which was adopted at its June 15, 2020, meeting. It extended the Moratorium through a vote at a City Council meeting on December 21, 2020. The minutes for these meetings were approved on June 15, 2020 (6/15/2020 City Council Minutes, ECF No. 13-8), June 24, 2020 (6/24/2020 City Council Minutes, ECF No. 13-20), and January 19, 2021 (1/19/2021 City Council Minutes, ECF No. 13-21), respectively. Accordingly, the 60-day limitation periods for challenging those actions expired on August 17,

2020, August 24, 2020, and March 22, 2021, respectively.  The plaintiffs in Case No. 1:21-cv-144 filed their complaint before the March 2021 date.  The other plaintiffs filed their complaint months later.  Thus, the only claim not barred by the statute of limitations is the challenge to the Moratorium extension vote on December 21, 2020, brought by the plaintiffs in Case No. 1:21-cv-144.

### 3.  Merits

The remaining aspect of the claim is meritless.  The City conducted its December 21, 2020, meeting by Zoom.  For a meeting held electronically, the OMA required the following in terms of advance notice:

> (a) Why the public body is meeting electronically.
>
> (b) How members of the public may participate in the meeting electronically.  If a telephone number, internet address, or both are needed to participate, that information must be provided specifically.
>
> (c) How members of the public may contact members of the public body to provide input or ask questions on any business that will come before the public body at the meeting.
>
> (d) How persons with disabilities may participate in the meeting.

Mich. Comp. Laws § 15.263a(4).

Here, the City points to the notice that it provided in advance of the meeting.  (*See* Notice of Public Meeting via Video Conference, ECF No. 117-20.)  The City Clerk, Ann Fidler, posted this notice on the City's website.  (Fidler Dep., ECF No. 117-2, PageID.3518-3519.)  On its face, the notice satisfies all the requirements of Mich. Comp. Laws § 15.263a(4).

Plaintiffs assert that the City's notice failed to satisfy subsections (a), (b), and (d) of Mich. Comp. Laws § 15.263a(4).  In their brief, however, Plaintiffs rely on what appears to be a different version of the notice obtained from the City's website.  Fidler testified that the City's website changed in 2021, and the notice she published in 2020 was not transferred to the new website.

(Fidler Dep., PageID.3519.)  Plaintiffs do not discuss the notice provided by the City or Fidler's testimony supporting it.  Nor do Plaintiffs provide support for the version they have provided.

Further, to establish a claim under the OMA, Plaintiffs must show that "noncompliance with the OMA has impaired the rights of the public."  *Jude v. Heselschwerdt*, 578 N.W.2d 704, 707 (Mich. Ct. App. 1998).  Here, Plaintiffs contend, without evidence, that their rights were impaired because the City failed to post information about how the public could participate electronically, leaving them unable to participate.  However, the City's notice provided a Zoom link for participation.  It also stated that members of the public could submit their comments in writing by email to the City Clerk.  (*See* Notice of Public Meeting, PageID.4079.)  Plaintiffs do not explain why the information provided by the City was inadequate and prevented them from participating.  Accordingly, the City is entitled to summary judgment for this claim.

### E. Count V (Substantive Due Process)

Both sides seek summary judgment on Count V, which asserts violations of substantive due process under federal and state law.  "'[S]ubstantive due process requires that both state legislative and administrative actions that deprive the citizen of 'life, liberty or property' must have some rational basis.'"  *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 862 (6th Cir. 2012) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1223 (6th Cir. 1992)).  "A plaintiff alleging a substantive due process violation resulting from a zoning decision must show 'that (1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action.'"  *Tollbrook, LLC v. City of Troy*, 774 F. App'x 929, 934 (6th Cir. 2019) (quoting *EJS Props.*, 698 F.3d at 855).

*Protected Property Interest.*  The City argues that Plaintiffs did not have a protected property interest that would give rise to a due process claim.  "Whether a person has a property interest is traditionally a question of state law.  Federal constitutional law, however, 'determines

whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause.'"  *Id.* (quoting *EJS Props.*, 698 F.3d at 856).  The Court of Appeals for the Sixth Circuit has indicated that Michigan property owners have a protected interest in uses that were permitted by a zoning classification.  *See Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 897 (6th Cir. 1991); *see also Tollbrook*, 774 F. App'x at 934 ("[A] property owner may have a property interest in the existing zoning classification of his or her property.").  As discussed above, however, Plaintiffs have not shown that their uses were permitted by the City's Zoning Ordinance.

The City also notes that, even if Plaintiffs have a protected interest in using their properties as short-term rentals, they would still have to comply with the permitting requirement in Ordinance 248.  And Plaintiffs do not have a protected interest in a short-term rental permit because a first-time applicant for a permit does not have such an interest.  *See Wojcik v. Romulus*, 257 F.3d 600, 610 (6th Cir. 2001) ("[A] first time liquor license applicant [is] not entitled to procedural due process rights under Michigan law."); *Women's Med. Prof. Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (citing *Wojcik* and holding that the plaintiff "has no property or liberty interest in a license for its operation because it was a first-time applicant for the ASF license").

Plaintiffs respond that *Wojcik, Women's Medical*, and similar cases involved the *discretionary* grant of a license; however, those cases do not discuss the issue of discretion.  Instead, they rely on the distinction between the *holder* of a license and a first-time applicant for one.  Like the first-time applicants in *Wojcik* and *Women's Medical*, Plaintiffs did not have a protected property interest in obtaining permits for operating their homes as short-term rentals.

Plaintiffs also rely on cases suggesting that there might be a legitimate claim of entitlement to a land use permit where the issuance of the permit is not discretionary.  *See, e.g.*, *Triomphe Invs.*

30

*v. City of Northwood*, 49 F.3d 198, 203 (6th Cir. 1995) (citing *Silver v. Franklin Twp. Bd. of Zoning App.*, 966 F.2d 1031, 1036 (6th Cir. 1992)); *Andreano v. City of Westlake*, 136 F. App'x 865 (6th Cir. 2005); *Oakwood Homeowners Assoc. at Stonecliffe v. City of Mackinac Island*, No. 99-1139, 2000 WL 1434708 (6th Cir. Sept. 20, 2000).  But those cases are not helpful for Plaintiffs.  There, courts concluded that there was no legitimate claim of entitlement to the permit because the decisions to issue the permit were discretionary, *see Triomphe Invs.*, 49 F.3d at 202-03 (also discussing *Silver*); *Andreano*, 136 F. App'x at 871, or because the plaintiffs never applied for one, *see Oakwood Homeowners Assoc.*, 2000 WL 1434708, at *3.  *See also EJS Props.*, 698 F.3d at 859 ("The law is clear that a party cannot have a property interest in a discretionary benefit[.]").  Those courts did not find that first-time applicants for a permit had a protected interest in one.

Also, those cases are distinguishable because they involved special use permits under zoning regulations.  They did not involve a permit to conduct a business activity like the permit at issue here, which requires inspections and compliance with a regulatory scheme.  Thus, Plaintiffs' case is more analogous to *Wojcik* and *Women's Medical* than *Triomphe* or *Silver*.

Next, Plaintiffs argue that they have an "interest" in being "free from arbitrary and irrational zoning decisions."  (Pls.' Reply Br. 7, ECF No. 122 (citing *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 428 U.S. 252, 263 (1977)).)  Here, Plaintiffs are conflating their constitutional claim with an interest protected by due process.  The City did not deprive Plaintiffs of their claim.  Accordingly, Plaintiffs have failed to demonstrate a protected interest, which is an essential element of a substantive due process claim.

*Arbitrary & Capricious Action.*  In addition, Plaintiffs have not shown arbitrary and capricious action necessary for a substantive due process claim because they have not shown that the City's actions were so irrational that they "shock the conscience."  *See EJS Props.*, 698 F.3d

at 862.  Zoning decisions do not shock the conscience if they survive "rational-basis review."  *See id.*  Under that standard, Plaintiffs must "negate every conceivable basis supporting the City Council's action."  *Id.* at 865 (quotation marks omitted); *see Houdek v. Centerville Twp.,* 741 N.W.2d 587, 597 (Mich. Ct. App. 2007) ("[T]o show that an ordinance is not rationally related to a legitimate governmental interest, a challenger must negate every conceivable basis that might support the ordinance or show that the ordinance is based solely on reasons totally unrelated to the pursuit of the State's goals.") (quotation marks omitted).

"Under rational basis review, the defendant 'has no obligation to produce evidence to sustain the rationality of its actions; its choice is presumptively valid and may be based on rational speculation unsupported by evidence or empirical data.'"  *Loesel v. City of Frankenmuth*, 692 F.3d 452, 465 (6th Cir. 2012) (quoting *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005)).  Thus, it is Plaintiffs' burden to demonstrate that the City's actions lack a rational basis.  *Id.*  They have not met that burden.

The City ostensibly passed the Moratorium due to various concerns about the impact of short-term rentals on the quality of life in the City, including declining school enrollment, declining long-term housing stock, declining long-term resident population, and an increase in vacant homes during winter months.  (*See* Resolution 2020-11, PageID.2362.)  It is not difficult to see how an increase in the number of properties used as short-term rentals could have the negative effects identified by the City.  Plaintiffs provide evidence suggesting that some of these concerns are not supported by available data, but Plaintiffs do not negate every conceivable basis for restrictions on short-term rentals, such as a decrease in available housing stock for long-term residents.  Furthermore, "courts have long recognized that municipalities may regulate in order to protect communities' 'residential character[.]'"  *Styller v. Zoning Bd. of App. of Lynnfield,* 169

N.E.3d 160, 171 (Mass. 2021) (quoting *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 394

(1926)).  "Short-term rental use of a one family home is inconsistent with the zoning purpose of

the single-residence zoning district in which it is situated, i.e., to preserve the residential character

of the neighborhood."  *Id.*; *see also Nekrilov v. City of Jersey City*, 45 F.4th 662, 681 (3d Cir.

2022) (upholding a short-term rental zoning restriction against a substantive due process challenge

because it furthered "several legitimate state interests," including "(1) protecting the long-term

housing supply; (2) reducing 'deleterious effects' on neighborhoods caused by short-term rentals;

and (3) protecting the residential character and density of neighborhoods").

The Moratorium paused the grant of new permits for short-term rentals while the City

considered "appropriate ordinance amendments" to address the City's concerns.  (Resolution

2020-11, PageID.2362.)  The City initially amended its regulatory ordinance through Ordinance

248.  Later, the City addressed its concerns about short-term rentals by limiting the total number

of them through Ordinance 253.  Thus, both the Moratorium and Ordinance 253 were rationally

related to the City's legitimate concerns.  Plaintiffs have not negated each of the City's concerns

and the relationship between the City's actions and those concerns.  Accordingly, Plaintiffs have

not shown arbitrary or capricious action.

Plaintiffs contend that Ordinance 253 is "oppressive" because it operates retroactively to

restrict Plaintiffs' property rights, in violation of state law.  (Pls.' Resp. to Def.'s Mot. for Summ.

J. 26, ECF No. 120.)  However, a violation of state law does not necessarily give rise to a

constitutional claim.  And the violation alleged here does not shock the conscience.  Therefore, the

Court will dismiss Plaintiffs' substantive due process claim.

### F. Count VI (Procedural Due Process)

The City seeks summary judgment on Plaintiffs' procedural due process claim.  Plaintiffs

argue that the City deprived them of due process by failing to provide them with adequate notice

of Ordinance 237 and the Moratorium.  They assert that the City did not provide individual notice by mail of Ordinance 237.  Also, Plaintiffs contend that the City provided no notice to the public before it adopted the Moratorium.

To prevail on a procedural due process claim, Plaintiffs must show "(1) [they] had a constitutionally protected interest, (2) [they were] deprived of that interest, and (3) the state did not afford [them] adequate procedures."  *Golf Vill. N., LLC v. City of Powell*, 42 F.4th 593, 598 (6th Cir. 2022).

*Protected Interest*.  Plaintiffs' due process claim fails to satisfy the first element.  As discussed above, Plaintiffs have not shown that they possessed a protected property interest.

*Adequate Process.*  The City also argues that it afforded Plaintiffs adequate process.  First, the City Council published notice of its meetings and then held a public meeting on April 15, 2019, at which Ordinance 237 was discussed and adopted.  It then published notice of the ordinance in a local newspaper along with information about how to obtain a copy, in accordance with Mich. Comp. Laws § 117.3(k).  (*See* Aff. of Publication, ECF No. 117-27, PageID.4127-4128.)

Next, the City adopted and extended the Moratorium via resolutions.  Under state law, resolutions do not require publication.  Instead, they require that the vote be recorded in the meeting minutes.  *See* Mich. Comp. Laws § 15.269(1).  That is what occurred here.  (*See* 6/15/2020 Minutes, ECF No. 13-8.)

In their response, Plaintiffs do not contest the process provided in connection with Ordinance 237.  Instead, they challenge the process provided in connection with the Moratorium. They assert that, in the context of zoning amendments, "when a  relatively small number of persons are affected on individual grounds, the right to a hearing is triggered."  *Nasierowski Bros.*, 949 F.2d at 896.  The latter category includes a situation where "a government unit singles out and

34

specifically targets an individual's property for a zoning change after notice of a general plan of amendment has been published." *Id.*

Plaintiffs do not fall into the category identified in *Nasierowski*. First, the Moratorium was not a zoning amendment. It did not rezone or reclassify any property. Instead, it paused the grant of permits under a regulatory scheme for short-term rentals. Second, the Moratorium did not single out or target a particular person, or even a relatively small number of persons, on individual grounds. Everyone in the City who was interested in using their property for short-term rentals and who did not already have a permit was affected by the Moratorium. Accordingly, Plaintiffs have not shown that they were entitled to notice or an opportunity to be heard before the City Council passed the Moratorium. Therefore, for all the foregoing reasons, Plaintiffs' procedural due process claim is meritless.

### G. Count VII (Equal Protection)

Both sides seek summary judgment on Plaintiffs' equal protection claim. Plaintiffs contend that the City has treated them differently from homeowners who rent their properties for the long term, i.e., more than 30 days at a time. They also contend that the City treated them differently from homeowners who were granted permits while the Moratorium was still in effect.

"To establish a claim for relief under the Equal Protection Clause, a plaintiff must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006), *overruled on other grounds as recognized by Davis v. Prison Health Servs.*, 679 F.3d 433, 442 n.3 (6th Cir. 2012). Plaintiffs do not assert that the City burdened a fundamental right or targeted a suspect class, so if they can prove disparate treatment, they must also prove that the City's disparate treatment had no rational basis. As indicated above, rational

basis review means that the City's actions "must be sustained if *any* conceivable basis rationally supports [them]." *TriHealth*, 430 F.3d at 790.

### 1. Long-Term Renters

Plaintiffs argue that they are similarly situated with owners who rent their properties for more than thirty days, and that there is no rational basis for treating them differently. The Court disagrees. As the City puts it, short-term rentals "operate more akin to commercial lodging and cater to transient populations, vacationers, bachelor/bachelorette parties, and others that have no stake in the community." (Def.'s Br. in Supp. of Mot. for Summ. J. 30, ECF No. 117.) In contrast, "long-term rentals . . . connote a permanency of residence akin to a homesteaded residence." (*Id.*) In other words, long-term rentals house people who are more likely to contribute to the community. There is a rational basis for treating them differently.

### 2. Permits Granted During Moratorium

Plaintiffs assert that they are similarly situated with Jeff McClorey and Ron Oselka, who were granted permits under exceptions to the Moratorium set forth in Resolution 2020-16. (*See* 6/28/2020 City Attorney Mem. re McClorey Application, ECF No. 122-6; Watson Dep., ECF No. 117-17, PageID.3875.) But with the possible exception of former Plaintiffs Ryan and Shawn Nofziger, none of the Plaintiffs submitted a permit application under the Moratorium exclusions in Resolution 2020-16. "[T]iming and context are both relevant to the similarly-situated inquiry" because "'differential treatment . . . may indicate a change in policy rather than an intent to discriminate.'" *Taylor Acquisitions, LLC v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009). Here, the City changed its policy by granting exceptions to the Moratorium for a limited time. Plaintiffs are not similarly situated with those who applied under the exceptions in Resolution 2020-16 because that resolution created a different policy for granting permits.

Furthermore, the City had a rational basis for this new policy, which created exceptions to the Moratorium for property owners with "investment-backed expectations" that developed shortly before the Moratorium was implemented.  In addition, the City had a rational basis for limiting the number of applicants who could qualify under these exceptions by limiting the time period for submitting those applications.  The purpose of the Moratorium was to freeze the number of existing short-term rental permits while the City considered modifications to its regulations for short-term rentals.  It did not have to grant any exceptions to the Moratorium to satisfy Plaintiffs' right to equal protection, but in doing so, it was not irrational to provide a window for submitting applications that sought a permit under specific exceptions.

Plaintiffs argue that McClorey and Oselka did not actually qualify for permits under Resolution 2020-16, yet the City gave them permits anyway.  For instance, the City Attorney determined that Oselka had a permit for construction of a new dwelling or renovation, yet Oselka submitted his application in December 2020, long after the Moratorium exception period expired.  (*See* Watson Dep., PageID.3888-3893.)  And McClorey apparently did not have a valid building permit, despite the City's belief that he did.  Regardless, Plaintiffs were not similarly situated with McClorey and Oselka because the latter applied at a different time and were considered for permits under a different set of rules.  Other than the Nofzigers, none of the Plaintiffs contend that they applied for a permit under any of the Moratorium exceptions in Resolution 2020-16.

### 3. Nofzigers

Unlike the other Plaintiffs, the Nofzigers applied in June 2020 under a Moratorium exception.  (*See* Nofziger Aff. ¶ 15, ECF No. 118-12, PageID.4309.)  They owned property located at 218 S. Bronson Street and possessed a building permit to make renovations in order to make their property suitable for short-term rentals.  (*Id.* ¶¶ 2, 16.)  The City denied their permit application.  The Nofzigers asked City officials for reconsideration several times, to no avail.  The

City now acknowledges that the Nofzigers qualified for a permit under an exception in Resolution 2020-16.  (Watson Dep., PageID.3935.)

### (a) Standing

The Nofzigers are no longer part of the case.  In March 2021, they recorded a quitclaim deed assigning their property to their company, 218 S Bronson LLC.  (Quit Claim Deed, ECF No. 117-15.)  After the Court consolidated Plaintiffs' cases in September 2021, the Nofzigers transferred their claims and their right to relief to 218 S Bronson LLC, which has replaced them as a party.  (*See* Nofziger Aff ¶ 4; Assignment of Claims, ECF No. 118-12, PageID.4316.)[6]

The City contends that 218 S Bronson LLC lacks standing because it did not own the property when the Nofzigers were denied a permit.  However, an assignee has standing to assert the rights of the assignor, including the right to assert claims that accrued to the assignor.  *See Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 271 (2008).

The City asserts that, because the property transfer preceded the transfer of claims by several months, the Nofzigers' claims were somehow mooted by the property transfer.  That argument does not follow.  For instance, an individual's ability to recover damages for past harm would not be mooted by the transfer of their property.  Accordingly, 218 S Bronson LLC has standing to assert claims for injuries suffered by the Nofzigers.

### (b) Merits

Plaintiffs assert that there was no rational basis for denying the Nofzigers' permit application, and the Court cannot discern one.  The City suggests that the denial may have been a mistake, but a jury could infer otherwise based on the City's repeated denial of the Nofzigers' application.  Also, the City offers no evidence to support their assertion, apart from speculation by

---

[6] The assignment document is undated, but it references the consolidation of these cases.

the City's Attorney.  Thus, Plaintiffs have provided sufficient evidence to undercut the City's explanation and the City offers no evidence in response.  Accordingly, there is no genuine dispute that the City denied the Nofzigers' right to equal protection because it denied their application, intentionally treating them differently from similarly situated applicants without a rational basis for doing so.  The Court will grant summary judgment on this claim in favor of 218 S Bronson LLC.

### H. Count VIII (Takings)

The United States and Michigan constitutions prohibit government taking of private property for public use without just compensation.  There are two types of takings, physical takings and regulatory takings.  A physical taking occurs when "the government physically takes possession of an interest in property for some public purpose[.]"  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321 (2002).  Here, Plaintiffs assert a regulatory taking, which occurs when "regulations . . . prohibit a property owner from making certain uses of her private property."  *Id.* at 321-22.   A physical taking always requires compensation, whereas a regulatory taking "'necessarily entails complex factual assessments of the purposes and economic effects of government actions.'"  *Id.* at 323 (quoting *Yee v. Escondido*, 503 U.S. 519, 523 (1992)).  In other words, "'if regulation goes too far, it will be recognized as a taking'" requiring compensation.  *Id.* at 326 (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

In *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), the Supreme Court held that a regulation "goes too far" when it calls upon the owner of real property to "sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle[.]"  *Id.* at 1019.  In such a case, the property owner is *categorically* entitled to compensation, "except to the extent that 'background principles of nuisance and property law'

independently restrict the owner's intended use of the property." *Lingle v. Chevron, U.S.A., Inc.*, 544 U.S. 528, 538 (2005) (citing *Lucas*, 505 U.S. at 1026-32). But *Lucas* does not apply here. The categorical rule in *Lucas* only applies to "the extraordinary case in which a regulation *permanently* deprives property of all value[.]" *Tahoe-Sierra*, 535 U.S. at 332 (emphasis added). The City correctly asserts that Plaintiffs have not shown that the City's actions have permanently deprived their properties of all value. For instance, those properties are still valuable as dwellings.

Plaintiffs respond that the City has deprived them of a property interest in using their properties as short-term rentals. They rely on the test in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), which considers several factors in the context of a non-categorical taking, including: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the 'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good[.]'" *Lingle*, 544 U.S. at 538-39 (quoting *Penn Central*, 438 U.S. at 124). The *Penn Central* test is the proper test for a regulatory taking like the one here, which does not permanently deprive a property of all value. The City does not address these factors in its briefing.

However, the City also argues that it did not take anything because Plaintiffs never possessed a vested right to a permit. A regulation does not constitute a taking if the party's interests "were not part of his title to begin with." *Lucas*, 505 U.S. at 1027; *see Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001) ("[T]he existence of a valid property interest is necessary in all takings claims."). Plaintiffs respond that the property right at issue is a "vested interest in the nonconforming use of their properties as short-term rentals." (Pls.' Resp. to Mot. for Summ. J. 31,

40

ECF No. 120.)  But Plaintiffs did not possess such a property interest for the reasons described in Section III.A, above.  Accordingly, they have not shown that they are entitled to compensation under Count VIII.

### I. Count IX (State Law Preemption)

In their last claim, Plaintiffs assert that the Moratorium was preempted by the MZEA, which allows lawful nonconforming uses to continue under a new zoning ordinance.  *See* Mich. Comp. Laws § 125.3208(1).  A state law can preempt a local regulation where there is a direct conflict between the two, i.e., "when 'the ordinance permits what the statute prohibits or the ordinance prohibits what the statute permits.'"  *DeRuiter v. Twp. of Byron*, 949 N.W.2d 91, 96 (Mich. 2020) (quoting *People v. Llewellyn*, 257 N.W.2d 902, 904 n.4 (Mich. 1977)).  Here, there is no conflict between the MZEA and the Moratorium because the Moratorium was not an ordinance, let alone a zoning ordinance.

Plaintiffs respond that *Ordinance 253* conflicts with the MZEA because it expressly limits short-term rentals to those properties that had obtained a short-term rental permit.  Plaintiffs contend that Ordinance 253 should allow all short-term rentals to continue as nonconforming uses. This claim is not properly before the Court because it is not part of Plaintiffs' complaint, which asserts that "the moratorium is preempted by [the MZEA]."  (*See* 2d Am. Compl. ¶ 365, ECF No. 61; 1st Am. Compl. ¶ 334, ECF No. 62.)  The complaint does not assert that Ordinance 253 is preempted by the MZEA.

At any rate, Plaintiffs' new claim is meritless because Plaintiffs have not shown that the Zoning Ordinance in effect before Ordinance 253 permitted short-term rentals.  In other words, they have not shown that short-term rentals were lawful uses that the MZEA would protect. Accordingly, the City is entitled to summary judgment for this claim.

## IV. CONCLUSION

For all the foregoing reasons, the Court will grant Plaintiffs' motion for summary judgment in part and deny the City's motion for summary judgment in part, solely as to the equal protection claim asserted by 218 S Bronson LLC in Count VII of the complaint.   In all other respects, Plaintiffs' motion for summary judgment will be denied and the City's motion for summary judgment will be granted.   Accordingly, the Court will dismiss all other claims.

An order will enter consistent with this Opinion.

Dated: October 31, 2022                    /s/ Hala Y. Jarbou
                                           HALA Y. JARBOU
                                           CHIEF UNITED STATES DISTRICT JUDGE